# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

# 09-23492

| | |
|---|---|
| Coscan Construction LLC on behalf of itself and all others similarly situated, | **CIV - HUCK** |
| Plaintiff, | MAGISTRATE JUDGE O'SULLIVAN |
| v. | C.A. NO: |
| HEIDELBERG CEMENT AG, VOTORANTIM CIMENTOS NORTH AMERICA, INC, TITAN AMERICA LLC, TITAN CEMENT COMPANY S.A., SUWANNEE AMERICAN CEMENT LLC, OLDCASTLE INC., CRH, PLC, LEHIGH HANSEN INC. LAFARGE NORTH AMERICA, INC., HOLCIM (US) INC., HOLCIM LTD., FLORIDA ROCK INDUSTRIES, INC., VULCAN MATERIALS COMPANY AND CEMEX CORP., | **CLASS ACTION COMPLAINT** |
| | JURY TRIAL DEMANDED |
| Defendants. | |

FILED by ___ D.C.
INTAKE

NOV 16 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

Plaintiff, Coscan Construction LLC, ("Plaintiff"), on behalf of itself, and all others similarly situated, hereby brings this action to obtain injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26 for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 4 of the Clayton Act to recover damages against Heidelberg Cement AG, Votorantim Cimentos North America, Inc., Titan America LLC, Titan Cement Company S.A., Suwannee American Cement LLC, Oldcastle Inc., CRH, plc, Lehigh Hansen Inc., Lafarge North America, Inc., Holcim (US) Inc., Holcim Ltd., Florida Rock Industries, Inc., Vulcan Materials Company and Cemex Corp., (collectively "Defendants"), for the injuries that Plaintiff and all others similarly situated sustained as a result of Defendants' violations of those laws.

Plaintiff's allegations as to itself and its own actions are based upon its own knowledge. All other allegations are based upon information and belief pursuant to the investigation of counsel. The Defendants have exclusive possession, custody or control of information and documents relating to their conspiracy to fix, raise, maintain and/or stabilize the prices of Portland cement ("Cement") and ready-mix concrete ("Concrete").

## NATURE OF CLAIM

1.      This case arises from a massive conspiracy among Portland cement manufacturers designed to fix, raise, maintain and/or stabilize the prices of Portland cement ("Cement") and ready-mix concrete ("Concrete") in the State of Florida in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

2.      Defendants are the leading manufacturers of Cement and control the Florida Cement market. Throughout the Class Period, Defendants conspired to fix the prices of Cement at supra-competitive levels by agreeing on the amount and timing of price increases and by allocating customers and markets, colluding on quotas, monopolizing the market and along with other anticompetitive acts, eliminating competition among themselves which resulted in substantial damages to Direct Purchasers of Cement and Concrete.

3.      As a result of this illegal conspiracy, Defendants charged supra-competitive prices for Cement and Concrete sold throughout the State of Florida, thereby injuring Plaintiff and members of the proposed Classes defined in paragraph 66 below.

4.      Defendants also dominate and control the Florida Concrete market. The primary ingredient of Concrete is Cement. A substantial number of the Concrete producers in Florida are wholly-owned by the Defendant Cement manufacturers. The Defendants have deceptively used fictitious artificial names for many of these companies in order to carry out their

massive price fixing conspiracy. This allowed Defendants to successfully conspire to fix the prices of Concrete at supra-competitive levels by agreeing on the amount and timing of price increases and by allocating customers and markets, colluding on quotas, monopolizing the market and among other anticompetitive acts, resulting in the elimination of competition among themselves which has resulted in substantial damages to Direct Purchasers of Concrete.

5.      As a result of Defendants' illegal conduct, Plaintiff and the other members of the Classes were uniformly impacted and suffered substantial economic loss because they paid artificially inflated prices for Cement and Concrete during the Class Period. Defendants' prices were grossly inflated and far exceeded the amount class members would have paid if the prices for Cement and Concrete had been determined by a competitive market. Each member of the Classes has suffered related economic harm as a result of Defendants' illegal conduct.

6.      In addition, Defendants' concerted actions in the Cement and Concrete markets were specifically aimed at eliminating their primary competitors in the Concrete market, independent legitimate Concrete producers, thus further reducing competition.

7.      Defendants' conspiracy has involved anticompetitive conduct by a cartel that has economically harmed direct purchasers throughout the State of Florida. The conspiracy has affected billions of dollars of commerce throughout the State of Florida and caused related economic loss to each member of the Classes.

8.      This conspiracy has included covert communications during which Defendants also expressly agreed to reduce the supply of Cement and Concrete and to fix, stabilize and increase prices at artificial levels.

9.      This action is brought as a class action on behalf of persons that directly

purchased Cement and Concrete from any of the Defendants between January 1, 2000 and the present.

## JURISDICTION AND VENUE

10.     This action arises under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 1, 15 and 26.

11.     This Court has jurisdiction under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, and 28 U.S.C. §§ 1331 and 1337.

12.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b) and (c). Defendants reside, transact business, are found, or have agents in this District. Further, a substantial part of the events or occurrences giving rise to the claims alleged occurred in the District.

## PARTIES

13.     Plaintiff, Coscan Construction LLC, is a Florida corporation with its principal place of business in Broward County, Florida. Throughout the Class Period, Plaintiff purchased Concrete directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

14.     Defendant Heidelberg Cement AG ("Heidelberg AG") is a foreign corporation based in Heidelberg, Germany which during the class period transacted business in the state of Florida, controlled all of the price fixing activities of Lehigh Cement and injured direct purchasers of cement and concrete.

15.     Heidelberg AG has, at all times material hereto, controlled Lehigh Cement, Inc. and Hanson Aggregates, which is now know as Lehigh Hanson, Inc. Heidelberg operates in Florida, among other fictitious names, under the name Hanson Heidelberg Cement Group.

Lehigh Hanson is one of the largest producers of ready-mixed concrete in the world.

16.    During the Class Period, Heidelberg AG, directly through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere.  These practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.

17.    During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, Heidelberg AG controlled directly the price and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

18.    Defendant Votorantim Cimentos North America, Inc. ("VCNA") is a Delaware corporation with its principal place of business in Toronto, Canada. VCNA is a subsidiary of Votorantim Group, a Brazilian industrial group. VCNA manufactures and sells Cement, Concrete, and aggregates in North America. VCNA operates approximately 31 Concrete suppliers in Florida through its subsidiary Prestige AB Ready Mix, Inc. ("Prestige"). During the Class Period, VCNA sold Cement throughout the United States and Concrete in the State of Florida.

19.    During the Class Period, VCNA, directly through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere.  These practices restrained trade or commerce in the United States and were willfully and knowingly designed to

have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.

20.     During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, VCNA controlled directly the price and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

21.     Defendant Titan America LLC ("Titan") is a Delaware Limited Liability Company with its principal place of business in Norfolk, Virginia. Titan's ultimate parent is Titan Cement Company S.A., a Greek company. Titan produces and sells Cement, Concrete and other building materials in the Eastern United States. Titan operates one Cement plant, one Cement import terminal and approximately 37 Concrete suppliers in Florida. During the Class Period, Titan sold Cement and Concrete in the State of Florida.

22.     During the Class Period, Titan, directly through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere. These practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.

23.     During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, Titan controlled directly the price and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

24.     Defendant Titan Cement Company S.A. ("Titan Cement") is a foreign corporation based in Athens, Greece which during the class period transacted business in the state of Florida

and injured direct purchasers of cement and concrete.

25.     During the Class Period, Titan Cement, directly through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere. These practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.

26.     During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, Titan Cement controlled directly the price and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

27.     Defendant Suwannee American Cement LLC ("Suwannee") is a Delaware limited liability company with its principal place of business in Branford, Florida. Suwannee's members are Anderson Columbia Company, a Florida corporation, and Votorantim Cimentos, part of the Brazilian Votorantim Group. Suwannee operates one Cement plant in Florida. During the Class Period, Suwannee sold Cement in the State of Florida.

28.     During the Class Period, Suwannee, directly through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere. These practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.

29.     During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, Suwanne controlled directly the price and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

30.     Defendant Oldcastle Inc. ("Oldcastle") is a Delaware corporation with its principal place of business in Atlanta, Georgia. Oldcastle is a subsidiary of CRH plc, an Irish corporation. Oldcastle claims to be the leading vertically-integrated supplier of aggregates, asphalt, Concrete and construction and paving services in the United States. Oldcastle partners with American Cement Company to produce and deliver Cement in Florida, and supplies Concrete through its subsidiary, Preferred Materials, Inc. Oldcastle operates one Cement plant and approximately 26 Concrete suppliers in Florida. During the Class Period, Oldcastle sold Cement and Concrete in the State of Florida.

31.     During the Class Period, Oldcastle, directly through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere. These practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.

32.     During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, Oldcastle controlled directly the price and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

33.     Defendant CRH, plc ("CRH") is a foreign corporation based in Dublin, Ireland which during the class period controlled all pricing decisions of Oldcastle and transacted

business in the state of Florida and injured direct purchasers of cement and concrete.

34.     CRH is one of the largest producers of Cement and Concrete and CRH has approximately 3,500 locations. It controls all of the activities of Oldcastle, Inc. in the United States with respect to pricing of aggregates, asphalt, and ready mix concrete.

35.     During the Class Period, CRH, directly through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere. These practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.

36.     During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, CRH controlled directly the price and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

37.     Defendant Lehigh Hanson Inc. ("Lehigh") is a Delaware corporation with its principal place of business in Allentown, Pennsylvania, which is in the process of moving its headquarters to Houston, Texas. Lehigh is a subsidiary of Heidelberg Cement AG, a German entity. Lehigh produces Cement, Concrete, aggregates, concrete pipe and block, and pre-cast and pre-stress concrete units throughout North America. In Florida, Lehigh obtains Cement from other manufacturers and imports Cement at the Port of Cape Canaveral through its subsidiary, Continental Florida Materials Inc. ("Continental"). Lehigh also sells Cement under the brand Continental. Lehigh operates three Cement import terminals and at least one Concrete supplier in Florida. During the Class Period, Lehigh sold Cement and Concrete in the State of Florida.

38.     During the Class Period, Lehigh directly through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere.  These practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.

39.     During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, Lehigh controlled directly the price and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

40.     Defendant Lafarge North America, Inc. ("Lafarge") is a Maryland corporation with its principal place of business in Herndon, Virginia. Lafarge is a part of Lafarge Group, a French entity. Lafarge manufactures and sells Cement, Concrete, gypsum wallboards, aggregates, asphalt, and related products and services. Lafarge operates one Cement import terminal and approximately four Concrete suppliers in Florida. During the Class Period, Lafarge sold Cement and Concrete in the State of Florida.

41.     During the Class Period, Lafarge, directly through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere.  These practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.  For example, Lagarge's worldwide aggregates and concrete

division is close to 50% of its cement division's revenues which accrue from the United States.

42.     During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, Lafarge controlled directly the price and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

43.     Defendant La Farge, S.A. ("La Farge SA") is a foreign corporation based in Paris, France which during the class period transacted business in the state of Florida, controlled all of the pricing activities of LaFarge and injured direct purchasers of cement and concrete.

44.     During the Class Period, LaFarge SA, directly through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere.  These practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.

45.     During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, LaFarge SA controlled directly the price and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

46.     Defendant Holcim (US) Inc. ("Holcim") is a Delaware corporation with its principal place of business in Waltham, Massachusetts. Holcim is a subsidiary of Holcim Ltd., a Swiss company. Holcim manufactures and sells Cement, Concrete, aggregates and asphalt. Holcim operates two Cement import terminals and at least one Concrete supplier in Florida. During the Class Period, Holcim sold Cement and Concrete in the State of Florida.

47.     During the Class Period, Holcim, directly through subsidiaries and/or affiliates that

it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere. These practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.

48.     During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, Holcim controlled directly the price and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

49.     Defendant Holcim Ltd. ("Holcim Ltd.") is a foreign corporation based in Zurich, Switzerland which during the class period transacted business in the state of Florida, controlled all of the pricing activities of Holcim (US) Inc. and injured direct purchasers of cement and concrete.

50.     During the Class Period, Holcim Ltd., directly through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere. These practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.

51.     During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, Holcim Ltd. controlled directly the price and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

52.     Defendant Florida Rock Industries, Inc. ("Florida Rock") is a New Jersey corporation with its principal place of business in Jacksonville, Florida. Florida Rock is a subsidiary of Vulcan Materials Company, a New Jersey corporation based in Alabama. Florida Rock manufactures and sells construction materials, including Cement, Concrete, aggregates, pre-stressed concrete, and concrete block. Florida Rock operates one Cement plant, two Cement import terminals, and approximately 63 Concrete suppliers in Florida. During the Class Period, Florida Rock sold Cement and Concrete in the State of Florida.

53.     During the Class Period, Florida Rock, directly through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere.  These practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.

54.     During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, Florida Rock controlled directly the price and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

55.     Defendant Vulcan Materials Company ("Vulcan") is a New Jersey corporation based in Birmingham, Alabama which during the class period transacted business in the state of Florida and injured direct purchasers of cement and concrete.

56.     In 2007, Vulcan acquired Florida Rock Industries.

57.     During the Class Period, Vulcan, directly through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did

unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere.  These practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.

58.     During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, Vulcan controlled directly the price and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

59.     Defendant Cemex Corp. ("Cemex") is a Delaware corporation with its principal place of business in Houston, Texas. Cemex Corp. is a wholly-owned subsidiary of CEMEX, S.A.B. de C.V., a Mexican corporation. Cemex produces and distributes Cement, Concrete, aggregate, concrete block, concrete pipe, and related building materials throughout the United States. Cemex operates three Cement plants, ten Cement import terminals, and approximately 71 Concrete suppliers in Florida. During the Class Period, Cemex sold Cement and Concrete in the State of Florida.

60.     During the Class Period, Cemex, directly through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere.  These practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.

61.     During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, Cemex controlled directly the price

and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

62.     Defendant Cemex S.A.B. de CV ("Cemex SAB de CV") is a foreign corporation based in Nuevo Leon, Mexico which during the class period transacted business in the state of Florida and injured direct purchasers of cement and concrete.

63.     During the Class Period, Cemex SAB de CV, directly through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices sold in and/or distributed in the State of Florida and elsewhere. These practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Cement and Concrete sold to Plaintiff and the Classes.

64.     During the Class Period, and as a direct and intended consequence of its involvement in the price-fixing conspiracy alleged herein, Cemex SAB de CV controlled directly the price and cost of Cement and Concrete sold in and/or distributed in the State of Florida.

65.     Various individuals, partnerships, corporations and associations not named as Defendants in this Complaint have participated as co-conspirators in the violations of law alleged herein and have performed acts and made statements in furtherance of the unlawful conduct. The identity of all co-conspirators is unknown at this time and will require discovery.

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action on its own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following two

Classes:

      (a) The "Cement Class" is defined as:

All persons or entities who purchased Cement directly from one or more of the Defendants or their co-conspirators in the State of Florida at any time during the period January 1, 2000 to the present. Excluded from the Florida Cement Class are Defendants and their subsidiaries, parents, or affiliates, Defendants' coconspirators, whether or not named as a Defendant in this Complaint, and government entities.

      (b) The "Concrete Class" is defined as:

All persons or entities who purchased Concrete directly from one or more of the Defendants or their co-conspirators in the State of Florida at any time during the period January 1, 2000 to the present. Excluded from the Florida Concrete Class are Defendants and their subsidiaries, parents, or affiliates, Defendants' coconspirators, whether or not named as a Defendant in this Complaint, and government entities.

67.    Plaintiff does not know the exact number of members of each class at this time. However, due to the nature of the trade or the commerce involved, Plaintiff believes that the members of each Class are geographically dispersed throughout Florida, and that joinder of all members of each Class would be impracticable. Plaintiff believes that there are at least thousands of members of each Class, and that their identities can be learned from Defendants' and their co-conspirators' books and records.

68.    Plaintiff's claims are typical of those of the Cement Class in that they are purchasers of Cement and their claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

69.    Plaintiff's claims are typical of those of the Concrete Class in that they are purchasers of Concrete and their claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

70.    Plaintiff will fairly and adequately protect the interests of the members of each

Class and have retained counsel competent and experienced in class action and antitrust litigation.

71.     Common questions of law and fact exist as to all members of each Class, which predominate over any questions affecting solely individual members of each Class. Among the questions of law and fact common to each Class are:

(a)     Whether Defendants and their co-conspirators conspired to raise, fix, maintain or stabilize the price of Cement and Concrete in the State of Florida, which members of each Class purchased;

(b)     The duration and extent of the contract, combination or conspiracy;

(c)     Whether Defendants' and their co-conspirators conduct violated the relevant federal antitrust laws and caused injury to the business and property of Plaintiff and the members of each Class and, if so, the proper measure of damages; and

(d)     Whether Defendants undertook actions to conceal their unlawful conspiracy.

72.     This Class action is superior to any alternatives for the fair and efficient adjudication of this controversy because:

(a)     It will avoid a multiplicity of suits and consequent burden on the courts and Defendants;

(b)     It would be virtually impossible for all Class members to intervene as parties-plaintiff in this action;

(c)     It will allow numerous individuals with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

(d)     As a class action it is appropriate for treatment on a fluid recovery basis, which will obviate any manageability problems; and

(e)     It will provide court oversight of the claims process, once Defendants' liability is adjudicated.

73.     Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to each Class as a whole.

**INTERSTATE TRADE AND COMMERCE**

74.     During the Class Period, there has been a continuous and uninterrupted flow of transactions in and shipments of Cement in interstate commerce throughout the United States and Florida. Concrete, which has Cement as its primary ingredient, is part of a continuous and uninterrupted flow of transactions and shipments in interstate commerce.

75.     A significant volume of Cement and construction materials was transported into Florida from other states and from other countries. The unlawful activities of Defendants and their co-conspirators have been coordinated and performed within the flow of interstate and international commerce.

76.     There are two relevant product markets: Cement and Concrete.

77.     The relevant geographic market for the purposes of this Complaint is the State of Florida.

78.     Cement is the major ingredient of Concrete. Since Cement is primarily sold to Concrete producers, demand for both products tends to rise and fall together. In Florida, the changes in consumption of Cement and Concrete paralleled each other during the past five years.

79.     The vast majority of Concrete manufacturers in Florida are wholly-owned
subsidiaries of the Defendant Cement manufacturers. The Defendants control their
respective wholly-owned subsidiary Concrete companies and coordinated their activities.

**Cement**

80.     Portland cement, the most common type of Cement, is the primary binding
ingredient in a number of construction materials, including Concrete.

81.     Cement is a fine powder. Raw materials for cement production include
limestone, clay, sand, and gypsum, which are all added at different stages of production.

82.     Cement is stored in silos and shipped by truck, rails, and barges. For smaller
projects, cement is stored in bags when shipped to customers.

83.     Cement is typically sold in bulk by the metric ton, priced in dollars per
metric ton, or in 94 lb. bags, priced in dollars per bag. Due to Cement's high weight and
low cost relative to volumes shipped, freight is a significant factor in the price at which
Cement is sold.

84.     In Florida in 2008, over 6.4 million metric tons of Cement, valued at
approximately one billion dollars, were produced at Cement plants owned and/or operated by
Defendants. Cement is a commodity.

85.     Concrete producers — consisting of those that are (1) wholly-owned and
operated by the Defendants, and (2) independently owned and operated consume
approximately 75% of the Cement used in Florida. The remainder of the Cement produced
by Defendants is sold to various types of concrete product manufacturers and contractors.
Concrete is a commodity.

86.     In addition to being produced within Florida and elsewhere in the United States,

Cement is imported into Florida and the United States from other countries, including China,

Canada, Columbia and Mexico, particularly during periods when demand for Cement is high,

such as at the peak of the housing boom around 2005.

87.     Due to widespread acquisitions and consolidation by the Defendants, the Florida

Cement market is now controlled by a small number of international companies, all of which

are Defendants.

88.     In late 2007, Cemex acquired Rinker Materials ("Rinker"), an Australian

Cement and construction materials company that had a significant presence in Florida and

elsewhere. Following the acquisition, Cemex has become the largest supplier of Cement and

Concrete in Florida.

89.     In October of 2009, Holcim Ltd. acquired substantial assets from Cemex

S.A.B. de C.V. for 1.7 billion.

**Concrete**

90.     Ready-mix concrete is a mixture of Cement, its primary component, and other

materials such as sand, gravel and water.

91.     Concrete is produced at batch plants, where the proportions of input materials are

measured, combined with water in a rotating drum mounted on a truck, and then mixed in the

truck's drum on the way to the construction site.

92.     The strength of the Concrete is determined by the amount of water added, and

is measured in pounds per square inch ("psi").

93.     Concrete is sold by the cubic yard, and is priced in dollars per cubic

yard.

94.     Concrete is used principally in commercial, governmental, and

residential construction. The primary purchasers of Concrete in Florida are construction companies. There are thousands of construction companies in the State of Florida. Absent the unlawful conspiracy, the Defendants' Concrete manufacturing subsidiaries would compete among themselves and with Independent legitimate competitors for the sale of Concrete in Florida.

95.     Large projects, such as municipal and commercial construction projects, require Concrete suppliers with significant resources. Suppliers must have access to a large amount of Concrete, as well as the ability to pour significant amounts of Concrete daily, to deliver Concrete of varying strength, to test the Concrete, and to send trucks to the construction site on a continuing basis to complete multiple pours.

96.     Concrete suppliers may also need to provide multiple batch plants in a geographic area, backup plants, many Concrete trucks, a well-trained workforce, the ability to produce Concrete for multiple specifications and large projects, and significant financial backing to remedy construction problems.

## ADDITIONAL FACTUAL ALLEGATIONS

97.     This case involves a massive conspiracy by Defendants to eliminate competition in the markets for Cement and Concrete by charging artificially high prices for Cement and Concrete in Florida.

98.     Defendants effectuated their unlawful conspiracy by engaging in the following conduct: (1) agreeing to fix, raise, maintain and/or stabilize prices of Cement; (2) agreeing to fix, raise, maintain and/or stabilize prices of Concrete; and (3) allocating customers and markets, including: (i) allocating Defendants' customers for Concrete; (ii) allocating Defendants' customers for Cement; (iii) allocating independent legitimate customers for

Concrete by territory; and (iv) dividing up the Florida Concrete market by territory.

99.     Defendants unlawfully conspired and agreed to artificially inflate prices for Cement and Concrete from at least January 1, 2000 to the present (the "Class Period").

100.    Through in-person meetings, telephone, and other communications, Defendants unlawfully agreed, among other things, to the magnitude and timing of price increases of Cement and Concrete and to refrain from competing for each others' Cement and Concrete customers throughout the Class Period.

101.    Defendants regularly met at trade association meetings, other events and even corporate meetings that were held at the same time in the same hotel, including at the United States concrete industry's annual trade show, held in Las Vegas, each winter.  For example, the Defendants and their representatives met at the World of Concrete 2008 Trade Show held at the Las Vegas Convention Center from January 22-25, 2008.

102.    For example, during the Class Period, the Defendants closely coordinated their activities including among the companies top executives.  Defendants facilitated the formation and implementation of the conspiracy. For example, Karl Watson, Jr., president of Rinker Materials West and, after the acquisition by Cemex, the Regional President of the Cemex's East Region, was a key participant in the conspiracy. Watson coordinated with other Defendant executives, including Jorge Wagner, President of Prestige/AB Ready Mix, Inc. ("Prestige," a subsidiary of VCNA), Rick Edwards, President of Florida Rock, and Harvey Johnson of Tarmac America LLC ("Tarmac," a subsidiary of Titan), as well as Robert Craddock, Executive Vice President of Commercial for Cemex. These individuals, among others, met on several occasions, including at least once during the Summer of 2008 in the Tampa area.

103.    The Defendants also met and coordinated their activities including at trade shows in

the State of Florida. One such meeting occurred in Orlando at the Orange County Convention Center in February of 2004.

104.    Defendants' unlawful agreement served several illicit purposes: to fix prices of Cement and Concrete in Florida and elsewhere, and to eliminate Defendants' primary competitors for the sale of Concrete — the independent legitimate producers.

105.    Defendants fixed, raised, maintained or stabilized Cement prices to noncompetitive, artificial levels in the State of Florida, and price competition among them was eliminated. Not only did Defendants fix the price of Cement through agreement, but also through customer and market allocation.

106.    By allocating customers of Cement, Defendants were able to maintain artificial prices and eliminate cheating by co-conspirators by preventing the purchasers of Cement, primarily the independent legitimate producers, from seeking out a better price for Cement from different Defendant manufacturers.

107.    Defendants also fixed, raised, maintained and/or stabilized Concrete prices to non-competitive, artificial levels in the State of Florida, and price competition among them was eliminated. Not only did Defendants fix the price of Concrete through agreement, but also through customer and market allocation.

108.    By allocating customers of Concrete, Defendants were able to maintain artificial prices and eliminate cheating by co-conspirators by preventing the purchasers of Concrete, primarily construction companies, from seeking out a better price for Concrete from different Defendants' wholly-owned concrete subsidiaries.

109.    Defendants' scheme placed the independent legitimate producers, who were the principal competitors of the Cement manufacturers' Concrete subsidiaries in Florida and not part of the conspiracy, at a severe competitive disadvantage. Indeed, one of the Defendants' principal purposes of the

conspiracy was to eliminate competition in the Concrete market.

110.     Fixing prices of both Cement and Concrete was an important element of the conspiracy. If they were able to buy Cement at prices set in a free and open market, the independent legitimate producers would be able to service customers of Concrete at competitive prices. Accordingly, any attempt by Defendants to collude only on sales of Concrete would be ineffective because the independent legitimate producers would be able to undercut the conspirators' prices. Thus, in order to successfully effectuate their conspiracy, Defendants collusively charged the independent legitimate producers (and other purchasers) supracompetitive prices for Cement.

111.     Because Cement is the main component of Concrete, by selling Cement to independent legitimate purchasers at artificially-inflated prices, Defendants were able, in effect, to increase prices that they had to charge their Concrete customers. Defendants' collusion on Cement prices thus kept independent concrete producers prices for Concrete artificially inflated and in line with the cartel prices for Concrete that Defendants themselves charged to customers, through their wholly-owned subsidiaries.

112.     Moreover, by artificially inflating the price of Cement, Defendants, through their Concrete subsidiaries, enabled themselves from time to time to offer lower Concrete prices (albeit at collusive levels) to purchasers, undercutting their competitors' prices to a point that they could not compete. The purpose was to ultimately drive their competitors from the market. This scheme permitted Defendants to gain control of an even greater share of the Concrete market in Florida.

113.     Defendants unlawfully profited from their anticompetitive conspiracy in multiple ways. First, they profited from sales of Cement to customers at collusively-established supra-competitive prices. Second, they profited from sales of Concrete that they supply, through subsidiaries, to their own customers, again, at supra-competitive prices and without competing with

each other. Third, insofar as Defendants' conspiracy drove their competitors out of the market entirely, Defendants were able to increase their market share and market power in a particular territory, and effectively eliminate all remaining price competition.

114.     Defendants met and agreed to artificially raise the prices for Cement and Concrete in Florida by agreeing on the magnitude and timing of price increases. As a result of the Defendants' conspiracy, prices for Cement and Concrete in Florida were fixed, raised, stabilized and/or maintained throughout the Class Period.

115.     Coordinated price increases for Cement and Concrete were regularly announced two times a year, typically in January and July. Each of the Defendants raised the price of Cement and Concrete by about the same amount and at the same time.

116.     In 2007, the Defendants coordinated price increases across the board, in the State of Florida, during a time of collapse of the housing market.

117.     For example, in 2008, the collapse of the housing market and the recession severely decreased demand for Concrete in Florida and elsewhere. Pursuant to their unlawful agreement, notwithstanding the substantial reduction in demand, Defendants announced a uniform increase in Concrete prices by $25 a cubic yard to $100/cubic yard, a 30% increase.

118.     Subsequent to these price announcements, Defendants implemented the agreed-upon price increases on Concrete sales to customers throughout Florida.

(a)     On August 4, 2008, Cemex announced that, effective October 1, it would increase its Concrete price to existing customers by $25 per cubic yard. Cemex also announced that it was ending its fuel surcharge.

(b)     On August 20, 2008, Tarmac announced a price increase of $25 per cubic yard for Concrete in Florida, thus raising the price to $100 per cubic yard. It also announced that it would

add or deduct $5 per cubic yard for each 1000 psi increment, effective September 25, 2008. Like Cemex, Tarmac announced that it was ending its fuel surcharge as well.

(c)  On September 12, 2008, Prestige announced a price increase for Concrete of $25 per cubic yard. It also announced that it would add or deduct $2.50 per cubic yard for each 500 psi increment, effective October 13, 2008. This brought Prestige's Concrete price to approximately $100 per cubic yard. Prestige announced that it was ending its fuel surcharge as well.

119.  Pursuant to their unlawful agreement, Defendants also agreed to fix the price of Cement. For example, in the fall of 2009, Defendants announced the same $15 per ton price increase for Cement in Florida:

(a)  On September 19, 2008, Lafarge issued a price announcement letter to customers signed by its District Sales Manager for Deep South Sales District and VP Marketing and Sales, U.S. East Business Unit, announcing a $15/ton price increase for Cement effective January 1, 2009.

(b)  On October 3, 2008, Cemex sent a letter to customers signed by Frank Craddock, Jr., Executive VP Commercial US Operations, announcing a $15/ton price increase for Cement effective January 1, 2009.

(c)  On October 8, 2008, Continental Florida Materials Inc. (owned by Lehigh) sent a letter to customers announcing a $15/ton price for Cement increase effective January 1, 2009.

(d)  On October 29, 2008, Titan sent a letter to customers announcing a $15/ton price increase for Cement effective January 1, 2009.

120.  Subsequent to their price announcements, Defendants implemented the agreed-upon price increases on Cement sales to customers throughout Florida.

121.  Beginning at least as early as 2000, Defendants also agreed to implement, and in fact implemented, uniform fuel surcharges on shipments of Cement and Concrete, tied to a published

index, purportedly to compensate for increasing prices of fuel. However, these surcharges did not correlate directly with the rise and fall of fuel prices, and previously had been simply included in the price of the Cement that Defendants sold.

122.    Also, in or about 2000, Defendants agreed to implement, and in fact implemented, uniform environmental surcharges on Concrete, purportedly to compensate Defendants for the cost of removing excess Concrete from a work site. Previously, this cost had been incorporated into the price of Concrete. The environmental surcharge was typically approximately $1 per cubic yard.

123.    As a result of Defendants' unlawful price-fixing conduct, Plaintiff and the Classes were injured by paying supra-competitive prices for Cement and Concrete in Florida throughout the Class Period.

124.    In addition to fixing Cement and Concrete prices in Florida through agreements, the Defendants also agreed to allocate customers and territories for Cement and Concrete, which further reduced or eliminated competition and supported their price-fixing agreement. Among the methods Defendants used were: (i) allocating Defendants' customers for Concrete; (ii) allocating Defendants' customers for Cement; (iii) allocating Customers for Concrete by territory; and (iv) dividing up the Florida Concrete market by territory.

125.    Due to the decrease in demand for Concrete, particularly during the last two years, Defendants also used their allocation scheme to drive their primary competitors for Concrete sales, out of the market.

126.    Sales personnel for the Defendants were instructed by their superiors to investigate their competitors, and to call competitors to track pricing of Concrete to customers.

127.    In addition, Defendants agreed to allocate their customers of Cement amongst

themselves. A purchaser seeking to purchase Cement from one of the Defendants would be routinely asked to identify its current Cement supplier, and if the customer requested Cement from a Defendant who was not the illegally allocated supplier for the Customer's business, the Defendant would refuse to supply the Cement or would offer it at prohibitively high prices.

128.   In addition, Defendants agreed to allocate their competitors' Concrete customers by territory. For example, in September 2009, Cemex, Florida Rock, Titan (through Tarmac), and VCNA (through Prestige), each agreed to cut their Concrete prices by $4-5 dollars/cubic yard to the customers of their competitors. While offering reduced Concrete prices to their customers, Defendants did not make comparable lower price offers to each other's customers. Further, they agreed that a particular Defendant only target competitors' customers in a specific region of Florida. Cemex targeted independent producer customers on the South Coast and Central region. Florida Rock targeted independent producer customers in the Jacksonville area. Titan targeted ICP customers on the Gulf Coast and VCNA targeted ICP customers in the Orlando area.

129.   Further, Defendants, led by Karl Watson, Jr. (Regional President of the Cemex's East Region), allocated among themselves geographic territories by county in the State of Florida. This is reflected by the fact that different regions in Florida are dominated by individual Defendants, and that Defendants engaged in Cement exchange transactions with each other rather than directly competing with each other for Concrete business that is close to their respective Cement plants.

130.   Another mechanism the Defendants used to implement their unlawful agreement was collusive Cement exchange transactions. This practice was against Defendants' independent economic self-interest and constituted coordinated action in furtherance of the conspiracy.

131.    Defendants' practices operated as a mechanism that Defendants have adopted to support their cartel and the supra-competitive prices that they charge.

132.    A similar practice took place when Defendants supplied each other with Cement for use in products other than Concrete. For example, when Rinker, since acquired by Cemex, purchased Cement from Florida Rock for its materials division, which produced concrete block and other products, Florida Rock invoiced Rinker at the artificially inflated "market" price. But at the end of the year, it credited Rinker with the difference between the inflated price and a lower price that Rinker and Florida Rock had agreed to charge each other for Cement.

133.    In addition to fixing prices and allocating customers and markets, many of the Defendants engaged in other acts to thwart competition in the markets for Cement and Concrete. These included: (i) coordinated supply restrictions; (ii) requiring concrete block purchasers to also purchase Defendants' Concrete; and (iii) supplying their competitors with inferior cement.

134.    The Defendants also coordinated supply restrictions. The Defendants coordinated an artificial product shortage in 2004 and then increased prices three times within a short time period during the alleged shortage of Cement in the spring of 2004. These price increases occurred in the context of Tarmac (a subsidiary of Defendant Titan) temporarily closing one of its Florida Cement plants to rectify a mechanical problem. The problem allegedly took six months to fix, much longer than typically necessary in the industry. At the time, Tarmac supplied about 10% of the Florida market. While the Tarmac plant was closed, Rinker (later acquired by Cemex) and Florida Rock scheduled maintenance shut downs, instead of delaying the maintenance to satisfy unmet demand. The combined plant shutdowns intentionally reduced capacity in Florida by about 33% during

29

much of the second half of 2004. Prices of Concrete increased accordingly.

135. At least some of the Defendants, including Florida Rock and Cemex, condition the sale of concrete block on the simultaneous purchase of Concrete. Cinder blocks, also known as concrete block, are a widely used building material in Florida. Defendants sell concrete block as well as Concrete, and control the market. During a period of shortage in concrete blocks around 2005, some Defendants refused to sell concrete block to customers unless customers also bought Concrete from Defendants at artificially inflated prices.

136. As a result of Defendants' unlawful conspiracy, prices for Cement and Concrete have been fixed, raised, maintained, and/or stabilized in Florida during the Class Period.

137. For example, the prices of Cement and Concrete in Florida have consistently risen or remained stable since 2000 — even after the end of the housing boom in 2005, the decline in commercial construction, the crash of the economy and the attendant drop in demand for Cement and Concrete. The increases in the price of Cement during this period are even higher when the fuel surcharge is incorporated.

138. Concentration in a particular industry facilitates the operation of a price-fixing cartel because it makes it easier to coordinate behavior among co-conspirators, and it makes it more difficult for customers to avoid the effects of collusive behavior.

139. The Cement market in Florida is concentrated. At all relevant times during the Class Period, Defendants controlled virtually all of the sales of Cement in Florida.

140. The Concrete market in Florida is also concentrated. As a result of a series of acquisitions, seven of the Defendants: Cemex, Lafarge, Lehigh, Holcim, Votorantim, Vulcan, and Titan, also own approximately 235 Concrete companies — or approximately 90% of the Concrete companies — in Florida.

30

141.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

142.    There are significant barriers to entry in the Cement market. Entry requires a company to incur significant start-up capital expenditures. Assuming a suitable location for a Cement plant in close proximity to a source of raw materials could be located, a new entrant into the business would have to incur hundreds of millions of dollars in costs, including those for the Cement plant and equipment, energy, transportation, distribution infrastructure and labor. Environmental laws increase the time, expense, and planning required.

143.    In addition, the backward vertical integration of existing Cement companies into quarries for supplies, and forward vertical integration of existing Cement companies into Concrete, impedes entry by new firms. This is because a new entrant would be disadvantaged unless it is able to enter at the various levels where Defendants themselves operate.

144.    Although the barriers to entering the Concrete market are not as substantial as those for the Cement market, they are nonetheless significant, requiring substantial start-up capital expenditures and resources for sustained operations. As noted earlier, in order to compete for large projects, a Concrete supplier must be able to provide multiple batch plants in a geographic area, backup plants, many Concrete trucks, a well-trained workforce, the ability to produce Concrete for multiple specifications, the demonstrated ability to handle large projects, and significant financial backing to remedy construction problems.

145.    "Elasticity" is a term used to describe the sensitivity of supply and demand to

changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small, if any, decline in the quantity sold of that product. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

146. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.

147. Demand for Cement and Concrete in Florida is highly inelastic. Cement is the primary ingredient in Concrete - it does not have a ready replacement. If there is an increase in the price of Cement, those needing Concrete are not likely to reduce their demand or to substitute other building materials.

148. Similarly, Concrete is a major and necessary component of commercial, governmental, and residential construction. A small but significant, non-transitory increase in the price of Concrete will not cause construction companies to switch to a different construction material, if such a material is even available and compatible with the needs of a given construction job.

149. The Department of Justice found the Concrete industry highly inelastic when it challenged an industry merger as anticompetitive, "a small but significant post-acquisition increase in the price of ready mix concrete that meets the bid specifications would not cause the purchasers of ready mix concrete for large projects to substitute another building material in sufficient quantities, or to utilize a supplier of ready mix concrete [who would otherwise not be considered a competitor for the business] with sufficient frequency so as to make such a price

increase unprofitable." *U.S.* v. *Cemex, S.A.B. de C. V.* Amended Complaint, D.D.C. No. 07-cv-006400, at 6-7.

150.   When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to unlawfully agree on the price for the product in question, and it is easier to effectively monitor agreed-upon prices. This makes it easier to form and sustain an unlawful cartel.

151.   Cement and Concrete are commodities, which are interchangeable across manufacturers. Although construction projects can be bid under various Cement and Concrete specifications, all of the Defendants have the equipment and expertise to meet these specifications.

152.   Although demand for Cement and Concrete in Florida has fallen significantly since 2005, average prices for Cement and Concrete in Florida have either increased or remained stable.

153.   Cement consumption in Florida peaked in 2005 at 11.2 million metric tons, a rise of 15.8% over the prior year, and then fell each year thereafter. Concrete consumption in Florida also peaked in 2005 at 49.5 million cubic yards, and then fell each year thereafter. Concrete consumption in 2008 was approximately 27.3 million cubic yards, down 21.6% from the prior year.

154.   Despite the decrease in demand in Florida for Cement and Concrete in recent years, prices of both products have been stable or increasing.

155.   The Defendants' need to maintain profits in the face of falling demand created incentives to conspire to fix prices and otherwise to avoid free and open competition.

156.   Although shipments of Cement in Florida have decreased significantly since 2005,

the price of cement has risen or remained stable.

157.    Market factors like those presented here are consistent with anticompetitive conduct and are highly suggestive of collusion.

158.    Participation in trade associations can foster and facilitate an unlawful conspiracy. Defendants are members of various trade associations, including the Florida Concrete and Products Association ("FCPA").

159.    Throughout the Class Period, Defendants participated in numerous trade association activities and events together, which provided numerous opportunities to conspire and share information.

160.    In addition, employees in the Cement and Concrete industries frequently move from company to company, further facilitating their communication and strengthening their relationships with their competitors.

161.    During the Class Period, in-person meetings among the Defendants took place before and after industry trade association meetings and related meetings, frequently shortly before price increase announcements. Some of these meetings include the following:

(a)    The Defendants regularly spoke with each other at meetings of the Florida Concrete and Products Association ("FCPA"), Southeastern Builder Conference ("SBC") and Associated Building Contractors ("ABC"). ABC frequently hosted evening meetings and monthly meetings, at which employees from many of the Defendants met.

(b)    The Voluntary Protection Program Association for Construction ("VPPAC") typically holds its annual meeting, World of Concrete, in Las Vegas, Nevada. The meeting is attended by thousands of industry officers and employees, including executives of the Defendants. The meeting has also been held in Orlando, Florida. At one of the meetings in

34

Orlando, Watson, Wagner, Craddock and Edwards discussed the coordination of pricing decisions. These and other individuals also stayed at the same hotel during this meeting, including the Peabody Orlando Hotel.

162. During the Class Period, Defendants also met at private company meetings. For example, Cemex held a company meeting at the West Palm Beach Airport Hilton Hotel. VCNA held a meeting in the same hotel at the same time. While representatives of both companies were at the hotel, Karl Watson, Sr. (then an officer of Cemex) met with Erik Madsen (CEO and President of VCNA) and Jorge Wagner (President of Prestige).

163. Simultaneous interaction by firms in multiple markets makes collusion easier to sustain. For example, although a firm with a competitive advantage in one market may be tempted to defect from a price-fixing agreement, it will be deterred from doing so if it knows that another firm would respond in a different market in which that other firm has a competitive advantage. Additionally, multi- market contact increases the frequency of interaction, permitting one firm to discipline another more rapidly than would otherwise be possible.

164. Defendants are significant players in the Cement and Concrete markets in Florida, as well as in most other states, and in many other countries. This multi-market contact makes it both desirable and feasible for Defendants to sustain collusion in the Florida markets.

165. Certain Defendants have previously been subject to antitrust fines in Europe, and are currently under investigation by the European Commission ("EC"), among other foreign competition authorities, for their anticompetitive activities in the Cement industry.

166. The EC has been investigating certain Defendants for about a year for engaging in anticompetitive behavior in the Cement industry. In October 2008, the EC raided the offices of a

number of Cement companies, including Cemex, Lafarge, Holcim, and Heidelberg, on suspicion of illegal cartel activity. The EC stated in a press release that it had "reason to believe" that the companies it raided may have violated Articles 81 and 82 of the EC Treaty, which prohibit price-fixing cartels and abuse of dominant position. The investigation seeks to uncover evidence of coordinated price movements, discriminatory pricing and market sharing.

167.    The Spanish offices of Cemex, Holcim, and several other Cement companies were raided in September 2009 by the EC for suspected price-fixing of Cement.

168.    In June 2009, the South African Competition Commission searched the offices of Cement companies, including Defendant Lafarge, for suspected price-fixing, customer and market allocation, and bid-rigging in the Cement market.

169.    In May 2009, the Mexican competition authority announced an investigation of cartel behavior by Defendant Cemex and other Cement companies.

170.    In December 2008, the Columbia antitrust regulator fined Cement companies, including Defendants Cemex and Holcim, for a conspiracy to fix prices.

171.    In December 2008, twenty Cement executives, including a Lafarge subsidiary executive, were found guilty of price-fixing by the Egyptian antitrust enforcement agency.

172.    In November 2007, Defendant Lafarge Brazil SA paid a fine of approximately $24 million to Brazil's antitrust administrative tribunal, the Council for Economic Defense ("CADE"), for violations of Brazil's competition laws and agreed to changes in its conduct.

173.    In December 2005, Taiwan fined twenty Cement companies, including Cemex, over $6.3 million for antitrust violations.

174.    In August 2005, Argentina fined six Cement companies fines totaling more than $28 million for antitrust violations.

175.     In 2003, the Federal Cartel Office of Germany fined Cement companies, including Defendants Lafarge, Cemex, HeidelbergCement (which controls Lehigh), and Holcim, record-breaking fines of €660 million for engaging in a cartel. Those fines were halved in June 2009.

176.     In 1994, the EC fined Lafarge and other Cement companies for operating a cartel and dividing markets.

177.     In formulating and effectuating their conspiracy, Defendants and their co-conspirators engaged in anticompetitive practices, the purpose and effect of which were to artificially raise, fix, stabilize and/or or maintain the price of Cement and Concrete in the State of Florida. These activities included:

(a)      Attending meetings or otherwise engaging in discussions and communications in Florida and elsewhere in the United States, face-to-face and by telephone, facsimile and electronic mail, regarding the sale of Cement and Concrete in Florida;

(b)      Agreeing during those meetings, discussions and communications to fix, raise, stabilize and/or or maintain the price of Cement and Concrete in the State of Florida;

(c)      Agreeing during those meetings, discussions and communications not to compete for one another's customers, either by refraining from submitting prices or bids to certain customers, and by refusing to provide, or to bid to provide, Cement or Concrete to certain customers;

(d)      Agreeing during those meetings, discussions and communications to allocate their competitor purchasers as Cement customers;

(e)      Agreeing during those meetings, discussions and communications to allocate the Concrete customers of independent legitimate purchasers;

37

(f)     Agreeing during those meetings, discussions and communications to drive independent legitimate purchasers from the market;

(g)     Exchanging price and customer information regarding Cement and Concrete in Florida with each other;

(h)     Selling Cement and Concrete to customers in Florida at collusive and noncompetitive prices pursuant to the agreement reached;

(i)     Accepting payment for Cement and Concrete sold in Florida at collusive and non-competitive prices;

(j)     Authorizing, directing, or consenting to the participation of subordinate employees in the conspiracy;

(k)     Engaging in cement exchanges with competitors at collusively discounted prices; and

(l)     Concealing the conspiracy and conspiratorial contacts through various means.

178.    Defendants' unlawful conspiracy had and is having the following effects, among others:

(a)     Price competition in the sale of Cement and Concrete has been restrained, suppressed, and/or eliminated in Florida;

(b)     Prices for Cement and Concrete sold by Defendants and their co-conspirators have been fixed, raised, stabilized and/or maintained at artificially high, noncompetitive levels throughout Florida; and

(c)     Customers who purchased Cement or Concrete directly from Defendants and their co-conspirators have been deprived of the benefits of free and

open competition.

179.   By reason of Defendants' violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the Classes have sustained injury to their business or property in amounts to be proven at trial. The injury sustained by Plaintiff and the Classes is the payment of supra-competitive prices to Defendants for Cement and Concrete during the Class Period. This is an injury of the type that the antitrust laws were meant to punish, prevent, and redress.

## FRAUDULENT CONCEALMENT

180.   Defendants fraudulently concealed their participation in the conspiracy alleged by, among other things, engaging in secret meetings and communications in furtherance of the conspiracy, and by holding themselves out as competitors to the public, to Plaintiff, and to each Class. Because of such fraudulent concealment, and the fact that a price-fixing conspiracy is inherently self-concealing, Plaintiff and the Classes could not have discovered the existence of this conspiracy absent the coming forward of industry participants who have provided relevant information.

181.   Throughout the Class Period, Defendants and their co-conspirators have affirmatively and fraudulently concealed their unlawful conduct from Plaintiff and the Classes to prevent Plaintiff and the Classes from suing them for the anticompetitive behavior alleged in this Complaint.

182.   Defendants wrongfully concealed their conspiracy by various means and methods that precluded detection, including but not limited to, secret meetings, misrepresentations to their Cement and Concrete customers concerning the reasons for increases in the prices of Cement and Concrete and surreptitious communications among Defendants by the use of the telephone, in- person meetings or trade association gatherings (and elsewhere) in order to prevent the existence of written records, limit

39

any explicit reference to competitor pricing communications on documents, and conceal the existence and nature of their competitor pricing discussions from non-conspirators.

183. Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

184. Defendants met and communicated secretly concerning customer and geographic allocation and pricing of Cement and Concrete so as to avoid detection of their illegal conspiracy.

185. During the Class Period, Defendants repeatedly attributed dramatic price increases to rising fuel and input costs, when in fact these costs did not justify the price increases. These statements were a pretext to conceal Defendants' conspiracy to fix prices of Cement and Concrete.

186. Defendants' purported reasons for price increases of Cement and Concrete were materially false and misleading and were made for the purpose of concealing Defendants' anticompetitive scheme as alleged in this Complaint.

187. Plaintiff and members of the Classes reasonably relied on the materially false or misleading explanations by Defendants for increases in the prices of Cement and Concrete, and Plaintiff and members of the Classes were lulled into believing that the increases were the result of normal competitive market forces, rather than the product of collusive activity by Defendants.

188. Defendants' public statements about the reasons for the price increases were designed to, and did, put Plaintiff and Class members off guard and caused them to accept the increases without undertaking further inquiry. Even had such inquiry been undertaken, it

would have proven futile because Plaintiff and members of the Classes did not have access to contemporaneous information that would have allowed them to evaluate whether Defendants' claimed justifications for the price increases were valid.

189.   At the time, Plaintiff and members of the Classes considered Defendants' articulated reasons for their price increases during the Class Period to be both normal and legitimate. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legality of Defendants' price increases.

190.   Moreover, by its very nature, Defendants' conspiracy was inherently self-concealing, and indeed the success of the conspiracy depended on its self-concealing nature.

191.   Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators until shortly before the filing of this Complaint, Plaintiff and members of the Classes had no knowledge of the alleged conspiracy, did not know that they were paying artificially high prices for Concrete and Cement, and had no knowledge of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

192.   At all relevant times and in all relevant respects, Plaintiff and other members of the Classes exercised reasonable diligence.

193.   None of the facts or information available to Plaintiff and members of the Classes prior to shortly before the filing of this Complaint, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged in this Complaint.

194.   As a result of Defendants' conduct and concealment of their conspiracy, Plaintiff and members of the Classes were prevented from suing for the anticompetitive

conduct of the Defendants alleged in this complaint until shortly before the filing of this Complaint.

195. Because of the active steps Defendants took, including fraudulent concealment of their conspiracy, to prevent Plaintiff and members of the Classes from suing them for the anticompetitive activities alleged in this complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

196. The running of any applicable statute of limitations has been equitably tolled as to any claims of Plaintiff and members of the Classes as a result of the anticompetitive conduct alleged in this complaint.

**COUNT ONE**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT AND**
**SECTION 4 OF THE CLAYTON ACT**

197. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint Plaintiff incorporate by reference the preceding allegations.

198. Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

199. The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators unreasonably to restrain trade and commerce. In furtherance of the conspiracy, Defendants fixed, raised, maintained, and stabilized prices for Cement and Concrete in the State of Florida, and refrained from competing with each other by allocating

customers and geographic territories. Defendants' conspiracy is a *per se* violation of the federal antitrust laws.

200.    Defendants' conspiracy, and resulting impact on the market for Cement and Concrete, occurred in or affected interstate and international commerce.

201.    As a direct and proximate result of the illegal contracts, combinations and conspiracies alleged herein, Plaintiff and the members of the Cement Class and Concrete Class were, and continue to be, damaged in their business or property by paying more for Cement and Concrete purchased directly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the illegal contracts, combinations and conspiracies.

202.    These violations are continuing and will continue unless enjoined by this Court.

203.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the Cement and Concrete Classed seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

A.    That the unlawful conspiracy alleged in this Complaint be adjudged and decreed to be an unreasonable restraint of trade or commerce, in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

B.    That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be appointed as class representatives, and that Plaintiff counsel be appointed as counsel for

43

the Classes;

C.    That Plaintiff and each Class recover the damages determined to have been sustained by them, trebled as provided by law, and that judgment be entered against Defendants, jointly and severally, on behalf of Plaintiff and each and every member of each Class;

D.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in this Complaint;

E.    Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.    That Plaintiff and each Class recover their costs of the suit, including attorneys' fees, as provided by law; and

G.    That the Court directs such further relief it may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable as a matter of right.

DATED:  November 16, 2009

Respectfully submitted,
The Plaintiff, Coscan Construction LLC
By its attorneys,

Kenneth G. Gilman, Esq.
FBN: 340758
GILMAN AND PASTOR, LLP
28100 Bonita Grande Drive
Suite 105

44

Bonita Springs, Florida 34135
Telephone: (877) 428-7374
Fascimile: (239) 221-8274
kgilman@gilmanpastor.com

Michael E. Utley, Esq.
Michael E. Utley P.C.
5959 Blue Lagoon Drive
Suite 200
Miami, Florida 33126-2052
Telephone: (305) 552-9628
Mike.utley@meupc.com

*Attorneys for Plaintiff, Coscan Construction LLC*

%JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**09 - 23492**

## I. (a) PLAINTIFFS

Coscan Construction LLC on behalf of itself and all others similarly situated

**DEFENDANTS**

Heidleberg Cement AG, Votorantim Cimentos North America, Inc. Tital America LLC, Titan Cement Company SA, Suwannee

**(b)** County of Residence of First Listed Plaintiff   Broward
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Germany
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**CIV - HUCK**

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Kenneth G. Gilman, Gilman and Pastor LLP
28100 Bonita Grand Drive, Suite 105
Bonita Springs, Florida 34135 Telephone: (877) 428-7374

**MAGISTRATE JUDGE
O'SULLIVAN**

Attorneys (If Known)

FILED by _____ D.C.
INTAKE

**NOV 16 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

09-CV-23492-Huck/O'Sullivan

**(d)** Check County Where Action Arose: ✓ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | | | |
|---|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ✓ 3 Federal Question (U.S. Government Not a Party) | | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) | | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ■ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | Appeal to District |
|---|---|---|---|---|---|
| ✓ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Re-filed- (see VI below) | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation ☐ 7 Judge from Magistrate Judgment |

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☐ NO    b) Related Cases ✓ YES ☐ NO

JUDGE Altonaga    DOCKET NUMBER 09-20187

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. Sections 1, 15, and 26

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

✓ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:

**JURY DEMAND:** ✓ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE
November 16, 2009

FOR OFFICE USE ONLY

AMOUNT $350.00   RECEIPT # 101195

11/16/09